IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

REC'D JAN -5

REC'D JAN -5

| | | |
|---|---|---|
| MUBARAK ALEXANDER, | : | |
| Plaintiff. | : | |
| | : | Civil Action No. 21-4633 |
| v. | : | |
| | : | |
| GREGORY VINGLESS and MATTHEW HARTMAN, | : | |
| Correctional Supervisors, in their individual and | : | |
| supervisory capacities; JEFFERY LONG, TIMOTHY | : | Judge Karen S. Marston |
| MORAN, JACOB STARK, ALEX PEREZ, and GEORGE | : | |
| SIMPSON, Correctional Officers, in their individual | : | |
| capacities; KRISTEN HILL, nurse, in her individual | : | |
| capacity; PAUL LAGANA, Warden, in his individual | : | |
| and official capacities; and BUCKS COUNTY; | : | JURY TRIAL DEMANDED |
| | : | |
| Defendants. | : | |

## FIRST AMENDED COMPLAINT

Plaintiff Mubarak Alexander ("Mr. Alexander"), by and through his undersigned counsel,

hereby submits this amended complaint pursuant to this Court's Order dated December 14, 2022,

and asserts claims pursuant to 42 U.S.C. §1983 alleging that the defendants, collectively,

deprived him of rights guaranteed by the U.S. Constitution.

### I. Preliminary Statement

This lawsuit arises from an assault upon Mr. Alexander which occurred during his

confinement as a pretrial detainee in the Bucks County Correctional Facility's ("BCCF") while

he was awaiting resolution of misdemeanor charges. At the time, Mr. Alexander was housed

within BCCF's Mental Health Unit ("MHU") where he was on "suicide watch."

On July 6, 2018 – while he remained on suicide watch within BCCF's MHU -- Mr.

Alexander was physically assaulted by multiple correctional officers ("COs"), including at least

two correctional supervisors, while he was confined to a "restraint chair" which rendered him

1

unable to move. The defendant COs jointly participated in the assault upon Mr. Alexander and, at one point, could be heard cheering each other one for their respective roles in the assault. Mr. Alexander suffered multiple physical and mental health injuries as a result of this assault, including a worsening of mental health symptoms.

Immediately following the assault, Mr. Alexander was taken to the BCCF Medical Unit where he came into contact with Nurse Kristen Hill who refused to provide him with any level of medical treatment and also failed to document Mr. Alexander's injuries.

Some time thereafter, Warden Paul Lagana initiated a conversation with Mr. Alexander in which he directed Mr. Alexander to discontinue filing "grievances" about the assault and to discontinue all further communications, with any other persons, about the assault.

Unfortunately, the July 6, 2018, assault upon Mr. Alexander was not an isolated incident – there have been numerous complaints of CO mistreatment of mentally ill inmates at BCCF, including other incidents involving inmates who, like Mr. Alexander, had been on suicide watch, and/or the MHU, at the time. Furthermore, the fact that seven (7) different COs, including two (2) supervisors, participated in this assault -- in full view of other BCCF inmates and staff -- serves as further evidence that such conduct was consistent with the policy, custom, and practice at BCCF and, in fact, that such behavior was condoned by those in a supervisory capacity.

It is also unfortunate that Bucks County does not adequately train its COs, including those who are assigned to work within the MHU, and/or with inmates on suicide watch, how to interact with mentally ill inmates. Contrary to national standards, Bucks County has no specialized Use of Force policy, or Use of Force training, which specifically applies to interactions with mentally ill inmates or to COs whose job function includes interaction with mentally ill inmates.

## II. Jurisdiction and Venue

1. In this Complaint, Mr. Alexander asserts claims pursuant to 42 U.S.C. §1983 and the Fourteenth Amendment of the U.S. Constitution.

2. Because Mr. Alexander is asserting claims pursuant to federal statutory and constitutional law, this Court has jurisdiction over these claims pursuant to 28 U.S.C. §§1331 and 1343(a)((3)-(4).

3. Venue is appropriate in this district pursuant to 28 U.S.C. §1391(b) because the events and omissions giving rise to this action occurred within BCCF which is located in Doylestown, Bucks County, Pennsylvania, within the Eastern District of Pennsylvania.

## III. Parties

4. Plaintiff Mr. Alexander is a resident of Pennsylvania who, at all times relevant hereto, was a pretrial detainee confined at within the BCCF MHU while awaiting adjudication and sentence on then-pending misdemeanor charges. While confined within the BCCF MHU, Mr. Alexander was physically assaulted by BCCF correctional officers who appeared to be acting in concert with one another. At the time of the filing of this amended complaint, Mr. Alexander is currently incarcerated at SCI-Houtzdale, a state correctional institution in Houtzdale, Pennsylvania.

5. Defendant Gregory Vingless ("Sgt. Vingless") was, at all times relevant hereto, employed by Bucks County as a supervisory correctional officer, holding the rank of sergeant, at BCCF. Sgt. Vingless is being sued herein in his individual and supervisory capacities.

6. Defendant Matthew Hartman ("Sgt. Hartman") was, at all times relevant hereto, employed by Bucks County as a supervisory correctional officer, holding the rank of sergeant, at BCCF. Sgt. Hartman is being sued herein in his individual and supervisory capacities.

7.      Defendant Jeffery Long ("CO Long") was, at all times relevant hereto, employed by Bucks County as a correctional officer at BCCF. CO Long is being sued herein in his individual capacity.

8.      Defendant Timothy Moran ("CO Moran") was, at all times relevant hereto, employed by Bucks County as a correctional officer at BCCF. CO Moran is being sued herein in his individual capacity.

9.      Defendant Jacob Stark ("CO Stark") was, at all times relevant hereto, employed by Bucks County as a correctional officer at BCCF. CO Stark is being sued herein in his individual capacity.

10.     Defendant Alex Perez ("CO Perez") was, at all times relevant hereto, employed by Bucks County as a correctional officer at BCCF. CO Perez is being sued herein in his individual capacity.

11.     Defendant George Simpson ("CO Simpson") was, at all times relevant hereto, employed by Bucks County as a correctional officer at BCCF. CO Simpson is being sued herein in his individual capacity.

12.     Defendant Kristen Hill ("Nurse Kristen") was, at all times relevant hereto, employed by PrimeCare Medical as a nurse at BCCF. Nurse Kristen is being sued in her individual capacity.

13.     Defendant Paul Lagana ("Warden Lagana") was, at all times relevant hereto, employed by Bucks County as the warden of BCCF. Warden Lagana is being sued herein in his individual, supervisory, and official capacities.

14.     Defendant Bucks County ("Bucks County") is a county government organized and existing under the laws of the Commonwealth of Pennsylvania with a principal place of business at Bucks County Courthouse, 55 East Court Street, Doylestown, Pennsylvania 18901. Bucks

County operates BCCF at 1730 South Easton Road, Doylestown, Pennsylvania 18901. At all times relevant hereto, Bucks County was acting by and through its duly authorized employees, agents, and/or administrators at BCCF who, at all times relevant hereto, were acting within the course and scope of their employment, under color of state law, and in accordance with Bucks County's policies, practices, and customs.

## IV. Facts

**A.    Mr. Alexander was a Pretrial Detainee on July 6, 2018.**

15.    On July 6, 2018, Mr. Alexander was a pretrial detainee at BCCF.

16.    Mr. Alexander was initially confined at BCCF on March 9, 2018, when he was arrested on a misdemeanor and given a cash bail he was unable to post.

17.    Mr. Alexander remained a pretrial detainee through November 16, 2020, the date on which he entered into a negotiated plea agreement and was sentenced in accordance thereto.[1]

**B.    On July 6, 2018, Mr. Alexander's mental health status was known to all defendants.**

18.    Since his arrival at BCCF on March 9, 2018, Mr. Alexander had been continuously treated for a number of mental health diagnoses and mental health symptoms, including a diagnosis of schizoaffective disorder and a symptom of auditory hallucinations.

19.    On July 6, 2018, Mr. Alexander was housed within BCCF's MHU.

20.    On July 6, 2018, Mr. Alexander was on "suicide watch" on BCCF's MHU.

---

[1]As will be described in Paragraphs 41 and 57, at some point following the July 6, 2018, assault upon him, Mr. Alexander was transferred to Norristown State Hospital to be evaluated for competency in his misdemeanor proceedings and, if found incompetent, to determine whether proper mental health treatment would restore his competence. He was later returned to BCCF while still a pretrial detainee awaiting disposition and sentencing. Therefore, Mr. Alexander was not continuously housed at BCCF for the full duration of time during which he was a pretrial detainee.

21.     Because Mr. Alexander was on suicide watch, he was being housed within a "dry cell" in which he did not have access to personal items, and his only permitted clothing was something known as a "suicide smock."

**C.      Mr. Alexander Was Assaulted by BCCF Correctional Officers – Including Supervisors -- on July 6, 2018, and suffered injuries therefrom.**

**1.      Mr. Alexander Was Physically Assaulted by BCCF Correctional Officers.**

22.     On July 6, 2018, between approximately 7:00 a.m.and 9:00 a.m., Mr. Alexander was in his suicide watch "dry cell" when Defendant COs – Sgt. Vingless, Sgt. Hartman, CO Long, CO Simpson, CO Perez, CO Moran, and CO Stark -- entered his cell and asked him to "cuff up."

23.     Mr. Alexander complied with the Defendant COs' request – he stood up and allowed them to place handcuffs upon his wrists.

24.     Mr. Alexander then allowed Defendant COs to escort him out of his cell to a restraint chair, located in the common area "day room" immediately adjacent to his cell, and the Defendant COs confined Mr. Alexander to the restraint chair.

25.     While in the restraint chair, Mr. Alexander's arms and legs were tightly strapped down to the chair so that he was unable to move them.

26.     While Mr. Alexander was in the restraint chair, with his arms and legal strapped down, Sgt. Vingless repeatedly punched, elbowed, and struck Mr. Alexander in the eye, mouth, face, head, chest, arms, and throughout Mr. Alexander's body, seemingly out of anger, for reasons unknown to Mr. Alexander.

27.     During Sgt. Vingless's continued assault upon Mr. Alexander, Mr. Alexander never threatened, provoked, assaulted, or resisted any defendant, or any other CO, nor did Mr. Alexander refuse to obey any orders because no orders were given.

28. Mr. Alexander remained confined to the restraint chair, with his arms and legs strapped down, while Sgt. Vingless was joined in his assaultive behavior by the remaining Defendant COs: Sgt. Hartman, CO Long, CO Simpson, CO Perez, CO Moran, and CO Stark.

29. Collectively, the Defendant COs repeatedly punched, kicked, elbowed, and kneed Mr. Alexander very hard in the legs, stomach, penis, and testicles and specifically grabbed and squeezed Mr. Alexander in the penis and testicles.

30. While the Defendant COs were jointly and collectively assaulting Mr. Alexander, who remained confined to the restraint chair, they began cheering each other on for their respective roles in the assault.

31. The assault described in the foregoing Paragraphs 22-30 caused Mr. Alexander to involuntarily scream, move, and cry out in pain.

32. The Defendants COs then responded to Mr. Alexander's involuntary pain response by telling him to stop resisting to the assault.

33. At this point in the assault, Mr. Alexander had sustained certain injuries -- including a busted eye, busted and bloody lip – which caused his face and mouth to drip a significant amount of blood.

34. While Mr. Alexander's face was dripping with blood, Sgt. Hartman put a towel around Mr. Alexander's bloody face and mouth.

35. While the towel was overing Mr. Alexander's face, Sgt. Hartman then began to wrap the towel around Mr. Alexander's face and neck, squeezing tightly, in an apparent attempt to smother, choke, and/or suffocate Mr. Alexander, and Mr. Alexander experienced difficulty breathing while the towel was held in this manner.

36.     Defendant COs then removed the towel from Mr. Alexander's face, replacing it with a

spit mask which covered the entirety of Mr. Alexander's face, and a large portion of his head,

thereby covering Mr. Alexander's bloody injuries to his eye, lip, mouth, and face then began to

use the spit mask to yank Mr. Alexander's face and head back, choking Mr. Alexander.

37.     Defendant COs kept the spit mask over Mr. Alexander's face and head as they

transported him from the MHU to the Medical Unit, as described in Section IV.C.3., *infra*.

### 2.     Mr. Alexander Suffered Injuries from Being Physically Assaulted BCCF Correctional Officers.

38.     As a result of his July 6, 2018, assault by Defendant COs, Mr. Alexander suffered

multiple injuries: a bloody and busted eye; a bloody and busted lip and mouth; bruises to his

arms, legs, and torso (both from the assault and from the tightness of the restraint chair straps on

his arms and legs); and extreme pain and swelling to his face, head, neck, penis and testicles.

39.     While many of Mr. Alexander's physical injuries healed – such as the cuts, bruises, and

swelling – some scar tissue remains, including a scar on his shin from a cut he had sustained

while being kicked in the shins while confined to the restraint chair.

40.     Mr. Alexander also suffered multiple mental health injuries as a result of this assault --

including an increase in auditory hallucinations and an increase in suicidality.

41.     At some point after the assault, Mr. Alexander was moved from BCCF, where he had

remained in a "dry cell" on suicide watch, to Norristown State Hospital for mental health

evaluation and treatment, before being returned to BCCF where he continued to be housed on the

MHU and/or suicide watch.

**3.** **Mr. Alexander Sought Medical Treatment for the Injuries He Sustained as a Result of Defendant's Assault Upon Him on July 6, 2018, but Defendant Nurse Kristen Refused to Provide Him with Medical Care for his Physical, and Mental Health, Injuries.**

42.     Immediately following the assault described above, Mr. Alexander was escorted by Defendants COs to the Medical Unit to receive medical treatment for the injuries he sustained in the assault.

43.     While being escorted from the MHU to the Medical Unit, Mr. Alexander remained confined to the restraint chair, and the restraint chair itself was moved to the Medical Unit.

44.     While Mr. Alexander was being transported from the MHU to the Medical Unit, and while he was still confined to the restraint chair, at least one of the Defendant COs, Sgt. Vingliss, continued to physically assault him, hitting him at least once.

45.     When Mr. Alexander arrived at the Medical Unit, he encountered Defendant Nurse Kristen.

46.     Mr. Alexander began his interaction with Nurse Kristen by asking that she photograph, and otherwise document, each of the injuries he sustained in the assault.

47.     Nurse Kristen refused to photograph, or otherwise document, Mr. Alexander's many injuries and, instead, told Mr. Alexander that his injuries should have been recorded by a handheld camera that Sgt. Hartman was supposed to have been operating pursuant to policies and/or practices that govern COs' removal of inmates from their cells.

48.     Mr. Alexander then attempted to explain to Nurse Kristen that his injuries had not been documented by any handheld camera because Sgt. Hartman had intentionally closed the camera and turned it off shortly after he had been removed from his cell.

49.    Nurse Kristen then directed the Defendant COs to remove Mr. Alexander from the Medical Unit, declared that Mr. Alexander was refusing medical treatment, and refused to provide any level of medical care.

50.    Despite injuries to the eye, mouth, and face – all of which were bloody – Nurse Kristen never referred or directed Mr. Alexander to see a dentist, get x-rays, receive sutures, or even receive bandages, and/or over-the-counter pain medication, or even have his open wounds cleaned.

51.    As Mr. Alexander was being escorted by Defendant COs away from the Medical Unit, he continued to assert that he was not denying medical care and that he actually wanted to receive medical treatment for his injuries.

52.    Despite Mr. Alexander's assertions of wanting to receive medical treatment for his visible injuries, Nurse Kristen continued to refuse to provide Mr. Alexander with medical care and continued to ask that Mr. Alexander be escorted off the Medical Unit.

53.    Defendant COs then removed Mr. Alexander, while still confined to his restraint chair, from the Medical Unit and took him to an empty shower stall where he sat, still confined to his restraint chair, until the next shift of COs came on duty and a correctional supervisor took him from the shower stall back to his cell and removed him from the restraint chair.

**D.    After the July 6, 2018, Assault Upon Mr. Alexander, Warden Lagana Spoke to Mr. Alexander About the Assault and Directed Mr. Alexander to Stop Submitting "Grievances" About the Assault and to Stop Discussing the Assault with Others**

54.    Some time after the assault, Warden Lagana approached Mr. Alexander and initiated a conversation with Mr. Alexander about the July 6, 2018, assault upon him.

55.    In that conversation, Warden Lagana directed Mr. Alexander to discontinue filing "grievances" about the assault.

56      Also in that conversation, Warden Lagana further directed Mr. Alexander to discontinue all further communications, with any other persons, about the assault.

57.     Mr. Alexander nonetheless continued to submit various written, oral, informal, and formal grievances, both personally and with the assistance of other inmates, regarding the July 6, 2018, assault to the full extent that he was able to do so in light of: (a) his ongoing and deteriorating mental health; (b) his confinement in a "dry cell" (without access to writing tools and without access to a law library); and (c) his temporary transfer to Norristown State Hospital, for mental health evaluation and treatment, before being returned to BCCF were he was continuously housed in the MHU and/or a suicide watch "dry cell."

58.     Mr. Alexander also continued to participate in investigative reviews of the incident by investigators both internal and external to BCCF to the full extent that he was aware of such investigative processes, and to the extent that such processes were available to him, whether or not he was capable of comprehending the distinctions and/or overlap of the various investigative processes.

59.     Mr. Alexander finally received a response to his "Level 1 grievance" on March 15, 2021 (*See* Doc 1, Exhibit A, Page 12 of 13). He was never told that any grievance he submitted was untimely. He initiated this lawsuit shortly after receiving this response to his Level 1 grievance.

**E.      The Assault Upon Mr. Alexander on July 6, 2018, Was A Direct Result of BCCF Policies, Practices, Customs and Procedures as Applied to Mentally Ill Inmates, and Bucks County's Failure to Provide Appropriate Training to COs Regarding Interactions with Mentally Ill Inmates**

**1.      The Assault Upon Mr. Alexander on July 6, 2018, Is Part of a Larger Pattern of Similar Incidents**

60.     The assault upon Mr. Alexander was not an isolated incident: there have been numerous other incidents of CO mistreatment of mentally ill inmates at BCCF, including other incidents

involving inmates who, like Mr. Alexander, had been on suicide watch at the time they were mistreated by BCCF COs for reasons relating to mental illness.

61.     Bucks County is aware of these other incidents because at least three (3) of these incidents have resulted in lawsuits against Bucks County, alleging COs' mistreatment of mentally inmates at BCCF, which Bucks County has had to defend, in this District Court, and there has been media coverage of at least one of these lawsuits.

62.     The July 6, 2018, assault was also not the only incident in which Mr. Alexander was mistreated by COs while on the MHU and/or on suicide watch.

        a.     Mr. Alexander was placed in the restraint chair, on multiple occasions, for not responding to CO commands that did not immediately impact his safety, the safety of others, or the safe operation of the correctional facility.

        b.     On at least one occasion, Mr. Alexander was stripped naked, without his suicide smock, and confined to a restraint chair in full view of both male and female inmates and staff.

63.     There have also been other incidents of mentally ill inmates at BCCF who, like Mr. Alexander, were confined to a restraint chair, either too frequently or for too long a duration of time -- for reasons unrelated to the health and/or safety of either the inmate being restrained, or other inmates, or for reasons relating to the safe functioning of the correctional institution – when those inmates' mental health prevented them from complying with CO orders.

64.     Bucks County is aware of these complaints of frequent unreasonable and/or excessive use of the restraint chair, as a means of controlling mentally ill inmates, because at least three (3) inmates have made complaints of frequent unreasonable and/or excessive use of a restraint chair within their lawsuits against Bucks County, which Bucks County has had to defend, in this District Court, and there has been media coverage of at least one of these lawsuits.

65.    These other incidents occurred during the same time period as Mr. Alexander's

confinement at BCC and have continued afterwards.

66.    The fact that complaints against Bucks County, alleging CO mistreatment of mentally

inmates at BCCF, have continued even after Mr. Alexander's assault in 2018, demonstrates that

Bucks County failed to correct this issue even after being made aware of it.

> **2.    The Circumstances of the July 6, 2018, Assault Upon Mr. Alexander – the Number of COs Involved, the Rank of COs Involved, and the Location of the Assault – Suggest a Culture in Which COs Believed That Such Behavior Would Not Be Punished**

67.    The fact that seven (7) different COs, including two (2) supervisors, participated in this

assault -- in a MHU common area where they could be seen by other MHU inmates (therefore

seeming to set a cautionary example to intimidate other MHU inmates) and staff (therefore

setting an example, to other staff, of BCCF culture) -- serves as further evidence that their

assaultive conduct was consistent with the custom, and practice at BCCF and, in fact, that such

assaultive behavior upon a mentally ill inmate was something which the COs expected would be

tolerated and not punished.

> **3.    Contrary to National Standards, Bucks County Fails to Provide Its COs With Adequate Specialized Training Regarding Their Interactions with Mentally Ill Inmates**

68.    Prior to the July 6, 2018, CO assault upon Mr. Alexander, Bucks County was aware of

the extremely high likelihood that BCCF COs would come into contact with mentally ill inmates.

       a.    As an objective matter, it is general knowledge that there is an extremely high

likelihood that COs will come into contact with mentally ill persons within correctional

institutions -- particularly COs who are assigned the task of working on a MHU and/or with

inmates on "suicide watch."

b.     An estimated sixty-four per cent (64%) of persons confined in county jails

nationally, and fifty-six per cent (56%) of persons confined in state prisons nationally, suffer

from some form of mental illness.  *Mental Health Problems of Prison and Jail Inmates*, Bureau

of Justice Statistics Special Report at p.1 (Revised December 14, 2006) (U.S. Dept. of Justice,

Office of Justice Programs).  Therefore, there is a high likelihood that BCCF CO's, who work in

a county jail, would have interactions with mentally ill inmates.

69.     Prior to the July 6, 2018, CO assault upon Mr. Alexander, Bucks County was aware of

the need for a specialized Use of Force policy pertaining to situations involving mentally ill

inmates.

a.     Inmates with mental illness are more likely to be injured in an altercation than

inmates without a mental illness.  *Id.* At p. 10.

b.     Because mentally ill inmates are so vulnerable in Use of Force situations, law

enforcement authorities nationwide – such as the Public Agency Training Council ("PATC")

(which provides training to both police and "corrections") and the Legal & Liability Risk

Management Institute ("LLRMI") (an organization which provides training and expert services

for law enforcement including "jails & corrections") -- are increasingly recognizing, and

acknowledging, the need for law enforcement officers to undergo specific training regarding the

Use of Force  in circumstances involving mentally ill persons so as to satisfy legal requirements.[2]

---

[2] *See* PATC, "Dealing with the Mentally Ill and Emotionally Disturbed in the Use of Force
Context" by Jack Ryan, J.D. (an attorney with over 20 years police experience as a police officer with the
Providence Police Dept., Providence, RI) (available online at:
http://www.patc.com/weeklyarticles/uof_mentallyill.shtml) ("Trainers should incorporate tactical issues
for dealing with the emotionally disturbed or mentally ill in use of force training" and "an agency that
fails to train officers that these circumstances may require different treatment may face liability for
deficient training"), LLRMI, "Legal/Liability Issues in the Training Function" (available online at:
https://www.llrmi.com/articles/legal_update/
liabilitytraining/) ("a number of cases suggest that agencies must conduct training for dealing with the
emotionally disturbed and mentally-ill persons in the context of use of force").

c.    Some specific "tactical issues" recommended in interactions between the mentally ill and law enforcement officers have been recognized by law enforcement authorities –including the LLRMI and the PATC (see FN herein) – which have cited the International Association of Chiefs of Police ("IACP") and its policy, first articulated in 1997, titled "Dealing with the Mentally Ill" as providing the prevailing standards for law enforcement and corrections officers' interactions with the mentally ill. *See* Ryan, Jack, LLRMI, *supra.*.

d.    The IACP's policy is premised upon the recognition that:

> Dealing with individuals in [law] enforcement and related contexts who are known or suspected to be mentally ill carries the potential for violence, requires an officer to make *difficult judgments* about the mental state and intent of the individual, and requires special [law enforcement] skills and abilities to effectively and legally deal with the person so as to avoid unnecessary violence and potential civil litigation.

*See* LLRMI, *supra* (emphasis added herein). *See also Carter*, 181 F.3d at 357 (recognizing the need for a specific type of training where "the situation involves a difficult choice").

70.    Applying the need for such specialized training to COs, mental health experts have opined that correctional officers, who "spend more time with inmates than anyone else" should receive specialized Use of Force training pertaining to mentally ill inmates. *See* Alexander, Lisa, *International Journal of Forensic Mental Health*, Vol. 3, No. 1, pp.37-54, at p. 39 (2004) (citing Appelbaum, K.L., Hickey, J.M., & Packer, "The role of correctional officers in multidisciplinary mental health care in prisons," *Psychiatric Services*, 52, pp.1343-47 (2001)).

71.    Contrary to national standards, Bucks County maintains no separate Use of Force policy which applies mentally ill inmates, nor does it provide specialized Use of Force training specific to mentally ill inmates.

_____

72.     Following the July 6, 2018, assault upon Mr. Alexander, one or more of the Defendant

COs was required to undergo specialized training pertaining to Use of Force, documentation of

Use of Force incidents, interactions with mentally ill inmates, use of restraint chairs, and/or

policies, practices, and procedures for inmates on "suicide watch."

73.     The fact that one of more involved Defendant COs was subjected to specialized training

following the July 6, 2018, assault raises credible inferences that Bucks County does not

routinely train its COs as to how to properly interact with mentally ill inmates as a preventative

measure.

### 4.     Bucks County Maintains Other Practices and/or Customs, Pertaining to Mentally Ill Inmates, Which Are at Odds with Generally Accepted Standards

74.     It is the common practice in Bucks County for mentally ill inmates who are placed on

"suicide watch" being placed in a "dry cell" (stripped of personal items and placed in a bare cell,

with only a "suicide smock" for clothing).

75.     It has also been reported that use of force, and forcible placement in a restraint chair, are

consistent with Bucks County practices and customs as related to mentally ill inmates.

### V.  Claims

### Count I
**Excessive Force**
**42 U.S.C. §1983**
**14th Amendment**
**Gregory Vingless & Matthew Hartman**
(in their individual and supervisory capacities)
**Jeffery Long, Timthy Moran, Jacob Stark, Alex Perez, And George Simpson**
(in their individual capacities)

76.     Mr. Alexander incorporates, by reference, Sections I through IV of this First Counseled

Complaint.

77. On July 6, 2018, Mr. Alexander was a pretrial detainee, confined within the BCCF MHU while awaiting disposition of then-pending misdemeanor charges, who was physically assaulted, while confined to a restraint chair (with arms and legs strapped down) by Defendant COs who acted in concert with one another and cheered each other on for their respective participation in the assault.

78. Since Mr. Alexander was a pretrial detainee at the time of his assault, "a pretrial detainee must show only that the force purposely or knowingly used against him was *objectively unreasonable*." *King v. Hendrickson*, 135 S.Ct. 2466, 2473 (2015) (citing *Graham v. Connor*, 490 U.S. 386, 395, n.10) (emphasis added).

79. As pleaded herein, Mr. Alexander asserts that the Defendant COs use of force against him was excessive and "objectively unreasonable" because:

    a.    Mr. Alexander was physically restrained – in a restraint chair with his arms and legs strapped down – throughout Defendant COs' assault upon him.

    b.    There were seven (7) different COs – including two (2) correctional supervisors – who actively participated in the assault upon Mr. Alexander while he was confined to the restraint chair.

    c.    Defendant COs could be heard cheering each other on for their respective participating in the assault upon Mr. Alexander while he was confined to the restraint chair.

    d.    Defendant COs were aware of Mr. Alexander's mental health status -- due to his placement in the BCCF's MHU, on "suicide watch" which included a specially-designated "dry cell" and "suicide smock" clothing -- at the time of the incident.

    e.    Mr. Alexander never threatened, provoked, assaulted, or resisted any defendant at any time during the Defendant COs' assault upon him.

80. Because each of the Defendant COs was personally involved in the physical assault, each is being sued in his individual capacity.

81. Furthermore, the two (2) supervisory COs – Sgt. Vingless and Sgt. Hartman – are being sued in their official capacity because "a supervisor may be personally liable under §1983 if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations." *See A.M. ex rel. J.M.K. v. Luzerne County*, 372 F.3d 572, 586 (3d Cir. 2004), *Santiago v. Warminster Twp.*, 629 F.3d 121, 129 n.5 (3d Cir. 2010), *Cannon v. City of Philadelphia*, 2014 WL 7399037 at *3 (E.D.Pa. 2014).

82. Both Sgt. Vingless and Sgt. Hartman, can be subjected to supervisory liability because each of them, as supervisors:

    a. personally participated in the assault;

    b. directed the assault against Mr. Alexander through both their personal assaultive behavior and by actively cheering on their subordinates for those subordinates' personal participation in the assault; and

    c. by observing, and cheering on, subordinates who they personally witnessed assaulting Mr. Alexander, both had knowledge of the subordinate COs' assaultive behavior and acquiesced to the behavior.

**Count II**
**Failure to Provide Adequate Medical Care**
**42 U.S.C. §1983**
**14th Amendment**
**Nurse Kristen Hill (in her individual capacity)**

83. Mr. Alexander incorporates, by reference, Paragraphs 1-82 of this First Counseled Complaint.

84.     As previously described in Paragraphs 15-17, *supra*, Mr. Alexander was a pretrial

detainee on July 6, 2018, the date on which he sought medical treatment from Nurse Kristen

immediately following his assault by the Defendant COs.

85.     Pretrial detainees' right to adequate medical care arises under the Fourteenth

Amendment's substantive due process clause, and "the Fourteenth Amendment affords pretrial

detainees protections at least as great as the Eighth Amendment protections available to a

convicted prisoner." *Moore v. Luffey*, 767 Fed.Appx. 335 (3d Cir. 2019) (citing *Natalie v.

Camden Cty. Corr. Facility*, 318 F.3d 575, 581 (3d Cir. 2003)).

86.     Applying that Eighth Amendment analysis, which sets the minimum standard of care

owed to Mr. Alexander as a pretrial detainee, Mr. Alexander hereby asserts that Nurse Kristen

showed "deliberate indifference" to his "serious medical need." *See Estelle v. Gamble*, 429 U.S.

97 (1976) (establishing the Eight Amendment analysis for deprivation of medical care claims for

convicted incarcerated persons).

87.     When Mr. Alexander was brought to Nurse Kristen's attention in the Medical Unit, his

physical injuries were "so obvious that a lay person would easily recognize the necessity" for

medical care, *Palakovic v. Wetzel*, 854 F.3d 209 (3d Cir. 2017) (citing *Monmouth Cty. Corr. Inst.

Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987) (defining a "serious medical need"

pursuant to Eighth Amendment analysis)):

     a.     Mr. Alexander was bleeding from injuries to his eye, lip, mouth, and face and

confined to a restraint chair with his arms and legs strapped down;

     b.     he was being escorted to the Medical Unit by COs pursuant to Use of Force

protocol and Defendant COs would have advised Nurse Kristen that Mr. Alexander was being

brought to her attention specifically for that reason;  and

      c.      Mr. Alexander specifically and repeatedly requested medical treatment and describing his physical injuries to Nurse Kristen;

88.     "Deliberate indifference" to a serious medical need includes the "unnecessary and wanton infliction of pain." *Estelle*, 429 U.S. at 104.

89.     When Nurse Kristen refused to provide medical treatment to Mr. Alexander -- despite the fact that he was bleeding from the eye, lip, mouth, and face; despite the fact that she had been told that he had been involved in a Use of Force incident, involving seven (7) COs, which occurred while he had been confined to a restraint chair and unable to move; and despite the fact that Mr. Alexander was telling her about both his injuries and complaining of physical pain – she showed "deliberate indifference" towards Mr. Alexander and engaged in an "unnecessary and wanton infliction of pain" upon Mr. Alexander.

**Count III**
**42 U.S.C. §1983**
**14th Amendment**
**Warden Paul Lagana**
(individual capacity/supervisory liability)

90.     Mr. Alexander incorporates, by reference, Paragraphs 1-89 of this First Counseled Complaint.

91.     As previously articulated, "a supervisor may be personally liable under §1983 if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations" *A.M. ex rel. J.M.K. v. Luzerne County*, 372 F.3d at 586 (3d Cir. 2004), *Santiago v. Warminster Twp.*, 629 F.3d at 129 n.5 (3d Cir. 2010), *Cannon v. City of Philadelphia*, 2014 WL 7399037 at *3 (E.D.Pa. 2014).

92. Warden Lagana displayed that he "had knowledge of" his subordinates' violations of Mr. Alexander's constitutional rights when he personally initiated a conversation with Mr. Alexander concerning the Defendant CO's assault upon Mr. Alexander,.

93. Warden Lagana displayed that he "acquiesced" to his subordinates' violations of Mr. Alexander's constitutional rights when he:

      a.      directed Mr. Alexander to discontinue his "grievances" regarding the COs' assault upon him; and

      b.      directed Mr. Alexander to discontinue communicated with others about the COs' assault upon him.

94. Because Warden Lagana both "had knowledge of," and "acquiesced in," his subordinates' objectively unreasonable use of excessive force against Mr. Alexander, he is being sued herein based upon a theory of supervisory liability.

**Count IV**
**42 U.S.C. §1983**
**14th Amendment**
*Monell v. N.Y.C. Dept. of Social Servs*, 436 U.S. 658 (1978)
"Practice or Custom"
**Bucks County**
**Warden Paul Lagana** (in his official capacity).

95. Mr. Alexander incorporates, by reference, Paragraphs 1-94 of this First Counseled Complaint.

96. Pursuant to *Monell v. N.Y.C. Dept. of Social Servs.*, 436 U.S. 658 (1978), a municipality can be held liable under §1983 if a municipal "practice" or "custom" leads to a violation of constitutional rights.

97. A "practice" or "custom" can give rise to municipal government liability when its usage is so significant or widespread that constructive knowledge may be inferred and when the

practice or custom remains uncorrected. *Bielevicz v. Dubinon*, 915 F.2d 845, 854 (3d Cir. 1990). *See also Watson v. Abington Twp.*, 478 F.3d 144, 156 (3d 2007), *Butler v. City of Philadelphia*, 478 F.3d 144 (E.D.Pa. 2014).

98.     Several factors create a reasonable inference that CO assaults upon mentally ill inmates is a widespread practice or custom within the culture of BCCF:

        a.      There have been other CO assaults upon mentally ill inmates at BCCF – including other mentally ill inmates who, like Mr. Alexander, were on "suicide watch" and housed in a "dry cell" dressed only in a "suicide smock";

        b.      There has been prior litigation concerning CO assaults upon mentally ill inmates at BCCF;

        c.      There have been media reports concerning CO assaults upon mentally ill inmates at BCCF;

        d.      The very nature of the July 6, 2018, CO assault upon Mr. Alexander demonstrates that such assaults were sufficiently commonplace that COs believed that their behavior was acceptable within the culture of BCCF:

                i.      No fewer than seven (7) different COs participated in the assault;

                ii.     Two (2) different CO supervisors participated in the assault; and

                iii.    The assault took place in a common area within the MHU were the assault could be seen by other inmates and staff (therefore suggesting to both inmates and staff that such behavior would be tolerated).

99.     Because of the widespread nature of CO assaults upon mentally ill inmates at BCCF, both Bucks County and Warden Lagana can be deemed to have constructive knowledge of this

practice or custom and, therefore, can be held liable for constitutional violations which occur as a result of this custom.

## Count V

**42 U.S.C. §1983**
**14th Amendment**
***Monell v. N.Y.C. Dept. of Social Servs*, 436 U.S. 658 (1978)**
Failure to Train
**Bucks County**

100.    Mr. Alexander incorporates, by reference, Paragraphs 1-99 of this First Counseled Complaint.

101.    A municipal agency, such as Bucks County, can be held liable for a failure to adequately train is COs if:

> in light of the duties assigned to specific officers or employees[,] the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need [for such training].

*City of Canton v. Harris*, 489 U.S. 378, 390 (1989). *See also Connick v. Thompson*, 563 U.S. 51, 62 (2011) (recognizing situations where the need for a specific kind of training "can be said to be 'so obvious' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional violations" even without evidence of a pattern of conduct.).

102.    The Third Circuit has applied the principles in *Canton* to cases alleging that a municipality's failure to properly train, supervise, and discipline CO's.  *See Thomas v. Cumberland Cnty.*, 749 F.3d 217 (3d Cir. 2014).

103.    The Third Circuit has also held that a municipality's failure to train amounts to deliberate indifference when:  (1) municipal policymakers know that employees will confront a particular situation; (2) the situation involves a difficult choice or a history of employees mishandling; and

(3) the wrong choice by an employee will frequently cause deprivation of constitutional rights."
*See Carter v. City of Phila.*, 181 F.3d 339, 357 (3d Cir.)

    a.    In the current case, Bucks County was aware that BCCF COs, particularly those who work on the MHU and/or with inmates on suicide watch, will come into contact with mentally ill inmates.

    b.    Bucks County was also aware that mentally ill inmates were more vulnerable to Use of Force incidents and more likely to be injured as a result of Use of Force incidents.

    c.    Bucks County was further aware that specific Use of Force tactics and techniques are necessary in situations involving mentally ill inmates and that, a failure to train COs regarding those specialized techniques was likely to result in a frequent deprivation of constitutional rights.

104.    Despite this awareness, Bucks County does not have a specialized Use of Force policy which applies specifically to mentally ill inmates and does not provide specialized Use of Force training regarding the specialized tactics and techniques which must be used for mentally ill inmates.

105.    Because Bucks County does not provide this specialized mental-health Use of Force training, despite its knowledge of the risk of frequent deprivations of constitutional rights, this failure to provide specialized mental-health Use of Force training constitutes "deliberate indifference."

106.    Additionally, in the instant case, following the July 6, 2018, assault upon Mr. Alexander, one or more of the involved COs was required to undergo specialized training pertaining to Use of Force, documentation of Use of Force incidents, interactions with mentally ill inmates, use of restraint chairs, and/or policies, practices, and procedures for inmates on "suicide watch."

107. The fact that one of more involved Defendant COs was subjected to specialized training *following* the July 6, 2018, assault raises credible inferences that Bucks County did not offer these COs that specialized training *before* the assault and, furthermore, does not routinely train its COs as to how to properly interact with mentally ill inmates as a preventative measure.

## VI. JURY TRIAL DEMAND

Plaintiff **Mubarak Alexander** respectfully demands a jury trial as to each count and each defendant.

## VI. Relief Sought

**Wherefore**, Plaintiff Mubarak Alexander, respectfully requests:

1. Compensatory damages for his physical and mental health injuries suffered as a result of the July 6, 2018, assault upon him by multiple BCCF COs;.

2. Punitive damages as permitted, and to the extent permitted, by law;

3. Reasonable attorney's fees pursuant to 42 U.S.C. §1988(b); and

4. Such other and further relief as the court may deem just and appropriate.

**Furthermore**, Plaintiff hereby demands a **JURY TRIAL**.

Respectfully submitted:

**MUBARAK ALEXANDER,**
*Plaintiff*

BY COUNSEL:

Amara Chaudhry Kravitz (Pa. Bar No. 92584)
150 Monument Road, Suite 207
Bala Cynwyd, PA 19004
Tel: (484) 686-2353 | Fax: (484) 278-6501
Email: amara@kravitz.law

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MUBARAK ALEXANDER, | : | |
| Plaintiff. | : | |
| | : | Civil Action No. 21-4633 |
| v. | : | |
| | : | |
| GREGORY VINGLESS and MATTHEW HARTMAN, | : | |
| Correctional Supervisors, in their individual and | : | |
| supervisory capacities; JEFFERY LONG, TIMOTHY | : | Judge Karen S. Marston |
| MORAN, JACOB STARK, ALEX PEREZ, and GEORGE | : | |
| SIMPSON, Correctional Officers, in their individual | : | |
| capacities; KRISTEN HILL, nurse, in her individual | : | |
| capacity; PAUL LAGANA, Warden, in his individual | : | |
| and official capacities; and BUCKS COUNTY; | : | JURY TRIAL DEMANDED |
| Defendants. | : | |

## CERTIFICATE OF SERVICE

As indicated by my signature below, I hereby certify that, on the date indicated below, a true and correct copy of this counseled amended complaint is being filed with the Court and will be available for viewing and downloading from the via this court's Electronic Case Filing (ECF) system on that date. All counsel of record will be served via electronic notification, and summonses are being prepared for all unrepresented parties.

01/05/2022
Date

*Amara Kravitz*
Amara Chaudhry Kravitz (Pa. Bar No. 92584)
150 Monument Road, Suite 207
Bala Cynwyd, PA 19004
Tel: (484) 686-2353 | Fax: (484) 278-6501
Email: contact@amaracivilrights.org