**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

MUBARAK ALEXANDER,                   :
    Plaintiff,                              :        CIVIL ACTION
                                            :
v.                                   :        NO. 21-CV-4633-KSM
                                            :
BUCKS COUNTY, *et al.*,              :
    Defendants.                             :

<u>MEMORANDUM</u>

MARSTON J.                                                              May 2, 2023

    Plaintiff Mubarak Alexander brings this civil rights complaint against Bucks County, seven Bucks County correctional officers (the "Officer Defendants")[1] at the Bucks County Correctional Facility ("BCCF"), Nurse Kristen Hill (a nurse at BCCF), and Warden Paul Lagana (the warden of BCCF).  Defendants Bucks County, Warden Lagana, and Sergeant Hartman have moved to dismiss the First Amended Complaint.  (Doc. No. 61.)  Nurse Hill has also filed a motion to dismiss the claims brought against her.  (Doc. No. 60.)  The Court will refer to Bucks County, Warden Lagana, Sergeant Hartman, and Nurse Hill collectively as the "Moving Defendants."

**I.      FACTS AND PROCEDURAL HISTORY**

    Taking the allegations in the Amended Complaint as true, the relevant facts are as follows.[2]

---

[1] The seven Officer Defendants are Sergeant Gregory Vingless, Sergeant Matthew Hartman, Officer Jeffery Long, Officer Timothy Moran, Officer Jacob Stark, Officer Alex Perez, and Officer George Simpson.

[2] "The District Court, in deciding a motion under Fed.R.Civ.P. 12(b)(6), [i]s required to accept as true all factual allegations in the complaint and draw all inferences from the facts alleged in the light most favorable to [the plaintiff]."  *Phillips v. County of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008).

On March 9, 2018, Alexander was arrested on a misdemeanor charge[3] and taken to BCCF.  (Doc. No. 56 at ¶ 16.)  While there, Alexander was treated for multiple mental health diagnoses, including schizoaffective disorder, and multiple mental health symptoms, including auditory hallucinations.  (*Id.* ¶ 18.)

## A.    The Assault

On July 6, 2018, while Alexander was on suicide watch and being housed in a "dry cell"[4] in BCCF's Mental Health Unit ("MHU"), the Officer Defendants entered his cell, handcuffed him, and escorted him to a common area.  Officer Defendants then placed Alexander in a restraint chair—a chair that allows officers to strap down a detainee's arms and legs so that he cannot move.  (*Id.* ¶¶ 20, 22–24.)  Once Alexander's arms and legs were restrained, Sergeant Vingless "repeatedly punched, elbowed, and struck Mr. Alexander in the eye, mouth, face, head, chest, arms, and throughout Mr. Alexander's body."  (*Id.* ¶ 26.)  The other Officer Defendants joined the assault, punching, kicking, elbowing, and kneeing Alexander in the "legs, stomach, penis, and testicles and specifically grabbed and squeezed Mr. Alexander's penis and testicles."  (*Id.* ¶ 29.)  Throughout the assault the Officer Defendants cheered each other on.  (*Id.* ¶ 30.)

At the end of the initial assault, Sergeant Hartman placed a towel around Alexander's face and neck, which were dripping blood, and squeezed tightly, making it difficult for Alexander to breathe.  (*Id.* ¶ 35.)  The towel was then replaced with a spit mask that covered "the entirety of Mr. Alexander's face, and a large portion of his head," and the Officer Defendants

---

[3] There seems to be a discrepancy in the First Amended Complaint.  The opening paragraphs state that Alexander was "awaiting resolution of misdemeanor *charges*," while paragraph 16 states he was "arrested on a [single] misdemeanor."  (*Compare* Doc. No. 56 at 1 (emphasis added), *with id.* ¶ 16.)

[4] According to the First Amended Complaint, a "dry cell" is a cell where the inmate is "stripped of personal items and placed in a bare cell, with only a 'suicide smock' for clothing."  (Doc. No. 56 at ¶ 74; *see also id.* ¶ 57 (explaining that while in a dry cell, the inmate has no access to writing tools or the prison's law library).)

yanked the mask back and forth, choking Alexander.  (*Id.* ¶ 36.)  The Officer Defendants

transported Alexander from the MHU to the BCCF Medical Unit ("MU") in the restraint chair

and spit mask.  (*Id.* ¶¶ 37, 43.)

### B.     Treatment After the Assault

When Alexander arrived at the MU, he met Nurse Hill and asked her to photograph and

document the injuries of his assault, but she refused, stating that the injuries "should have been

recorded by a handheld camera that Sgt. Hartman was supposed to have been operating pursuant

to policies and/or practices that govern [the] removal of inmates from their cells."  (*Id.* ¶¶ 45–

47.)  Alexander told Nurse Hill that Sergeant Hartman had turned the camera off not long after

he was removed from the cell, but Nurse Hill refused to listen.  (*Id.* ¶ 48.)  She then told the

Officer Defendants to remove Alexander from the MU because he was "refusing medical

treatment."  (*Id.* ¶ 49.)

Alexander told the Officer Defendants that he was not refusing medical treatment and to

the contrary, wanted treatment for his injuries, which included a "bloody and busted lip and

mouth; bruises to his arms, legs, and torso; and extreme pain and swelling to his face, head, neck,

penis, and testicles."  (*Id.* ¶¶ 38, 51.)  But despite his obvious injuries, Nurse Hill refused to

provide any medical care,[5] and the Officer Defendants took Alexander, who was still confined to

a restraint chair, from the MU to an empty shower stall.  (*Id.* ¶ 53.)  They left him in the shower

stall until the next shift, when a different correctional supervisor took him from the shower stall

back to his cell and removed him from the restraint chair.  (*Id.*)

---

[5] Among other things, she failed to refer Alexander to see a dentist, get x-rays, receive sutures,
receive bandages, receive pain medications, or have his wounds cleaned.  (*Id.* ¶ 50.)

### C.      Alexander's Grievances

In the weeks that followed the assault, Alexander filed multiple "written, oral, informal, and formal grievances, both personally and with the assistance of other inmates." (*Id.* ¶ 57.) Warden Lagana approached Alexander to discuss the July 6, 2018 assault and directed him to stop filing grievances and speaking to other persons about the incident. (*Id.* ¶¶ 55–56.) Nevertheless, Alexander continued to submit grievances related to the assault, "to the full extent that he was able to do so in light of: (a) his ongoing and deteriorating mental health; (b) his confinement in 'dry cell' [of the MHU] (without access to writing tools and without access to a law library); and his temporary transfer to Norristown State Hospital, for mental health evaluation and treatment." (*Id.* ¶ 57.)[6]

On March 15, 2021, Alexander received a response to a grievance that he had filed with the Bucks County Prison Oversight Board in October 2020. (Doc. No. 1 at 12.) According to the response, the Board had investigated Alexander's allegations and learned that "the guard who struck you was immediately fired by prison officials" and "[t]he other guards who were present during the incident were retrained." (*Id.*) Given these actions by the Department of Corrections, the Board viewed the grievance investigation as concluded. (*Id.*)

### D.      Procedural History

On October 20, 2021, Alexander filed a *pro se* Complaint in this Court under 42 U.S.C. § 1983. (Doc. No. 1.) The Court later granted him leave to proceed *in forma pauperis* (Doc. No. 6) and granted his request for appointment of counsel (Doc. No. 25 (referring the case to the Prisoner Civil Rights Panel Program); *see also* Doc. No. 26 (appointing Amara Kravitz, Esq. to

---

[6] After the assault Alexander suffered from an increase in auditory hallucinations and suicidality, and he was moved from BCCF to Norristown State Hospital for mental health evaluation and treatment, before being returned to BCCF's MHU. (*Id.* ¶¶ 40–41.)

represent Alexander in this action)).  On January 5, 2023, Plaintiff's counsel filed an Amended

Complaint on Alexander's behalf.  (Doc. No. 56.)  The Amended Complaint asserts five counts

under 42 U.S.C. § 1983:

- Count I:  Excessive Force in Violation of the 14th Amendment against Sergeants Vingless and Hartman in their individual and supervisory capacities and against Officers Long, Moran, Stark, Perez, and Simpson in their individual capacities

- Count II:  Failure to Provide Adequate Medical Care in Violation of the 14th Amendment against Nurse Hill in her individual capacity

- Count III:  14th Amendment Violations against Warden Lagana in his individual and supervisory capacities

- Count IV:  14th Amendment Violations against Bucks County[7] pursuant to *Monell v. NYC Dep't of Soc. Servs.*, 436 U.S. 658 (1978) ("Practice or Custom")

- Count V:  14th Amendment Violations against Bucks County pursuant to *Monell* ("Failure to Train")

(Doc. No. 56 at 16–25.)  Moving Defendants ask the Court to dismiss the claims asserted against

them under Federal Rule of Civil Procedure 12(b)(6).  (*See* Doc. No. 60 (Motion to Dismiss by

Nurse Hill); Doc. No. 61 (Motion to Dismiss by Defendants Bucks County, Warden Lagana, and

Sergeant Hartman).)  Alexander opposes their motions.  (*See* Doc. Nos. 62, 63, 65, 66.)

## II.   LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009) (quotation marks omitted).  "A claim has facial plausibility when the

---

[7] Count IV is also brought against Warden Lagana in his official capacity.  Because an official capacity claim is indistinguishable from a claim asserted against the government entity, Count IV is, in all practical respects, asserted only against Bucks County.  *See Walthour v. Child & Youth Servs.*, 728 F. Supp. 2d 628, 641 (E.D. Pa. 2010) ("A claim against a person in his official capacity is equivalent to a claim against the municipality that employs him.  In other words, an official capacity suit is simply another way of pleading an action against the entity of which the official is an agent.") (internal citations omitted).

plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

"As a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings." *In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997). "However, an exception to the general rule is that a document *integral to or explicitly relied* upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment." *Id.* (cleaned up). The court may also "consider matters of public record, orders, exhibits attached to the complaint and items appearing in the record of the case." *Keystone Redevelopment Partners, LLC v. Decker*, 631 F.3d 89, 95 (3d Cir. 2011) (quotation marks omitted).

### III.   DISCUSSION

Moving Defendants argue that the claims asserted against them are barred by the applicable statute of limitations. (Doc. No. 60 at 2–3; Doc. No. 61-1 at 5–7.) In addition, Bucks County argues that the *Monell* claims asserted against it should be dismissed for failure to state a claim, and Warden Lagana argues that the claims asserted against him must be dismissed for lack of personal involvement. (Doc. No. 61-1 at 7–11.) Finally, Bucks County argues that the demand for punitive damages is inappropriate as against it and should be stricken. (*Id.* at 11.) The Court addresses each argument in turn.

#### A.   Statute of Limitations

First, Moving Defendants argue that the claims asserted against them should be dismissed because the statute of limitations has run. (Doc. No. 60 at 2–3; Doc. No. 61-1 at 5–7.) "Typically a statute of limitations defense cannot be raised in a Rule 12(b)(6) motion." *Barclay*

*v. Washington*, CIVIL ACTION No. 14-6257, 2015 WL 6102344, at *2 (E.D. Pa. Oct. 15, 2015). However, "when it appears on the face of the complaint that the statute of limitations has expired, the complaint may be dismissed at the pretrial stage." *Id.*; *accord Benak ex rel. Alliance Premier Growth Fund v. Alliance Capital Mgmt. L.P.*, 435 F.3d 396, 400 n.14 (3d Cir. 2006) ("A statute of limitations defense is an affirmative one, and in order to undergird a dismissal, must appear on the face of the complaint.").

Claims brought under § 1983 are subject to state statutes of limitations for personal injury actions. *Owens v. Okure*, 488 U.S. 235, 250 (1989); *see also Garvin v. City of Philadelphia*, 354 F.3d 215, 220 (3d Cir. 2003) ("Claims, such as Garvin's, brought under section 1983 are subject to state statutes of limitations governing personal injury actions."). In Pennsylvania, that limitations period is two years. *Garvin*, 354 F.3d at 220; 42 Pa. Stat. & Cons. Stat. § 5524(7) ("The following actions and proceedings must be commenced within two years: . . . Any other action or proceeding to recover damages for injury to person or property which is founded on negligent, intentional, or otherwise tortious conduct . . . .").

The state limitations period is, however, tolled while a prisoner exhausts administrative remedies as required by the Prisoner Litigation Reform Act ("PLRA").[8] *Pearson*, 775 F.3d at 603 ("[T]he PLRA is a statutory prohibition that tolls Pennsylvania's statute of limitations while a prisoner exhausts administrative remedies . . . ."). Moving Defendants argue that tolling is irrelevant here because Alexander did not file a formal "Level 1 grievance" until October 2020, which was *after* the limitations period ran in July 2020. (Doc. No. 61-1 at 6.) But this misreads

---

[8] The PLRA states that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Pearson v. Sec'y Dep't of Corr.*, 775 F.3d 598, 603 (3d Cir. 2015) ("[T]he PLRA merely requires exhaustion of administrative remedies prior to the initiation of a §1983 claim.").

the First Amended Complaint.

Alexander alleges that he filed numerous grievances, "written, oral, informal and formal . . . both personally and with the assistance of other inmates, regarding the July 6, 2018, assault." (Doc. No. 56 at ¶ 57.) However, he did not receive a formal response to any grievance until March 2021, which was in response to his "most recent" grievance of October 2020. (*Id.* ¶ 59; *see also* Doc. No. 1 at ¶ 31 (explaining that Alexander filed his "most recent" grievance in October 2020, and Defendants "finally responded with the response dated March 15, 2021").) These allegations suggest Alexander filed numerous grievances about the assault before the October 2020 date identified by Defendants.

Moreover, Alexander alleges that Warden Lagana interfered with his grievances, directing him to stop filing grievances and not to speak with anyone about the assault. (Doc. No. 56 at ¶¶ 54–56.) This allegation further suggests: (1) that Alexander filed multiple grievances related to the assault, even if they were not labeled a "Level 1 grievance," (2) that prison officials were aware of those grievances, and (3) that those officials, including Warden Lagana, interfered in the investigation of his grievances.[9] *See Revell v. Port Auth. of N.Y., N.J.*, 598 F.3d 128, 134 (3d Cir. 2010) ("A court confronted with a Rule 12(b)(6) motion must accept the truth of all factual allegations in the complaint and must draw all reasonable inferences in favor of the non-movant.").

Finally, the Court rejects Nurse Hill's contention that Alexander's grievances "regarding" the assault necessarily did not include complaints that Nurse Hill refused to provide medical care

---

[9] Questions about potential interference by prison officials have continued into this federal action, with the Court receiving a "Motion to Withdraw" on November 25, 2022, purportedly from Alexander. (*See* Doc. No. 43 at 1 (asking the Court to "withdraw and close" this case).) Alexander later testified under oath that he did not author the letter and had no desire to withdraw his case. (*See* Doc. No. 55.)

for Alexander's injuries.  (*See generally* Doc. Nos. 60, 64.)  Viewing Alexander's allegations broadly, as we must at this stage, a grievance "regarding the July 6, 2018 assault" could include not only the attack by the Officer Defendants, but also Nurse Hill's failure to provide medical care after the attack and prison officials' failure to appropriately respond to the assault.

Whether Alexander filed grievances related to the assault, and the timing and scope of any grievance, are issues the parties can explore during discovery.  These issues are, of course, in addition to the open questions surrounding the extent to which the grievance process was available to Alexander given his ongoing mental health struggles, his confinement in the MHU, his transfer to Norristown State Hospital, and the potential interference by prison officials.

Because it is unclear from the face of the First Amended Complaint when the statute of limitations was tolled, dismissal is improper at this stage.  *See Schmidt v. Skolas*, 770 F.3d 241, 251–52 (3d Cir. 2014) (explaining that if a complaint "does not reveal when the limitations period began to run, the statute of limitations cannot justify Rule 12 dismissal") (cleaned up); *see also Barclay*, 2015 WL 6102344, at *2–3 ("It is apparent from the complaint that Barclay did pursue his administrative remedies.  What is not known is the period of time that passed while he exhausted those remedies.  Without knowing how long the limitations period was tolled, we cannot determine whether the statute of limitations had expired before Barclay filed this action. Because we cannot determine whether Barclay's federal claims are time-barred, we cannot dismiss those claims.").

If appropriate, Defendants may raise the statute of limitations defense at summary judgment.

### B.   *Monell* Claims

Next, Bucks County argues that Alexander's § 1983 claims against it must be dismissed because he has failed to show that the Officer Defendants' actions are attributable to the County.

The Court analyzes whether Alexander has stated a valid claim for excessive force against the Officer Defendants before determining whether he has plausibly alleged that the County may be liable for that claim.

### 1.     Excessive Force

Alexander claims that Officer Defendants violated his Fourteenth Amendment right to be free of excessive force.  As a pretrial detainee, Alexander must show that "the force purposely or knowingly used against him was objectively unreasonable." *Kingsley v. Hendrickson*, 576 U.S. 389, 396–97 (2015).  "[O]bjective reasonableness turns on the 'facts and circumstances of each particular case.'"  *Id.* at 397 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).  A court makes this determination "from the perspective of a reasonable officer on the scene," considering "what the officer knew at the time," and accounting for "the legitimate interests that stem from the government's need to manage the facility in which the individual is detained."  *Id.* (cleaned up).  Considerations that may bear on the reasonableness of the force used include:  "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting."  *Id.*

Here, Alexander alleges that seven officers, including two supervisors, removed him from his cell in the MHU, handcuffed him, strapped him into a restraint chair, and then, "repeatedly punched, kicked, elbowed, and kneed Alexander in the legs, stomach, penis, and testicles," while he was compliant and unable to move.  (Doc. No. 56 at ¶¶ 22–30.)  Viewing these allegations as true, the Court finds that an unprompted, group-assault of a restrained and compliant inmate is inhumane and atrocious, let alone "objectively unreasonable."  *See Jacobs v. Cumberland County*, 8 F.4th 187, 195–96 (3d Cir. 2021) ("[T]he evidence construed in the light

most favorable to Jacobs could lead a reasonable jury to find that Williams used objectively unreasonable force.  First, jurors could conclude that Williams and his fellow officers were not facing a disturbance or any other threat to jail security. . . .  A reasonable factfinder could also conclude that Jacobs posed no threat through the encounter [and] that Williams struck Jacobs while Jacobs was defenseless and obeying orders. . . .  Under this set of facts, a jury could find that there was no penological need for *any* additional force—making each of Williams's strikes wholly gratuitous and objectively unreasonable.").

## 2.   Municipal Liability

Having found that Alexander adequately alleges a deprivation of his Fourteenth Amendment right to be free from excessive force, the Court must next determine whether the Officer Defendants' conduct is plausibly attributable to the County under § 1983 and *Monell*.

Section 1983 states, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

42 U.S.C. § 1983.  A municipality can be held liable under § 1983 only "when the alleged constitutional transgression implements or executes a policy, regulation or decision officially adopted by the governing body or informally adopted by them."  *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996) (citing *Monell v. N.Y. City Dep't of Soc. Servs.*, 436 U.S. 658 (1978)).  Put differently, a municipality "may not be held liable on a theory of vicarious liability rooted in respondeat superior," but it may be held liable "when the injury inflicted is permitted under its adopted policy or custom."  *Mulholland v. County of Berks*, 706 F.3d 227, 237 (3d Cir. 2013) (citing *Beck*, 89 F.3d at 971).

Courts have recognized two avenues to municipal liability under *Monell*.  "A plaintiff

may put forth that an unconstitutional policy or custom of the municipality led to his or her

injuries, or that they were caused by a failure or inadequacy by the municipality that reflects a

deliberate or conscious choice." *Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019) (citations

omitted); *Benson v. Delaware County*, CIVIL ACTION NO. 21-2854, 2022 WL 784475, at *3

(E.D. Pa. Mar. 15, 2022).  Here, Alexander claims that Bucks County is liable under both

theories.  He alleges that there is a widespread practice or custom at BCCF of assaulting

compliant and restrained mentally ill inmates (Count IV) and that the County has failed to

adequately train correctional officers on the use of force that is appropriate in situations

involving inmates with mental illnesses (Count V).  (*See* Doc. No. 56 at 21–25.)  Bucks County

argues that both claims should be dismissed because Alexander has "failed to adequately plead

the existence of a practice or custom of mistreatment of mentally ill inmates," and has failed to

identify BCCF's training policies or allege whether the Officer Defendants were acting in

accordance with those policies.  (Doc. No. 61-1 at 7–9.)  The Court addresses each theory in

turn.

### a.  Custom or Practice

In Count IV of the First Amended Complaint, Alexander claims Bucks County has a

custom or practice of mistreating mentally ill inmates at BCCF, and he provides three bases for

finding a custom or practice.  (Doc. No. 56 at ¶¶ 60–66.)  First, Alexander alleges that there

"have been numerous other incidents of [correctional officers'] mistreatment of mentally ill

inmates at BCCF, including other incidents involving inmates who, like Mr. Alexander, had been

on suicide watch at the time they were mistreated."  (*Id.* ¶ 60; *see also id.* ¶ 63 (alleging "other

incidents of mentally ill inmates at BCCF who, like Mr. Alexander, were confined to a restraint

chair, either too frequently or for too long a duration of time").)[10]  He also notes that there have

been at least three similar lawsuits brought against Bucks County in recent years that alleged

mistreatment of inmates in the MHU at BCCF and the unreasonable use of a restraint chair to

control inmates with mental illnesses.  (*Id.*at ¶ 61.)  Second, Alexander alleges that this is not the

only time when he was confined to a restraint chair for reasons unrelated to his own safety, the

safety of other inmates, and the safe operation of BCCF.  (*Id.* at ¶¶ 62–63 (alleging that on at

least one other occasion, Alexander was "stripped naked, without his suicide smock, and

confined to a restraint chair in full view of both male and female inmates and staff").)  Third,

Alexander argues that the facts surrounding his July 6, 2018 assault—including the fact that the

assault occurred in the common area of the MHU, that the Officer Defendants cheered each other

on, that Nurse Hill refused to record his injuries, and that Warden Lagana ordered him to stop

filing grievances—suggest that the officers' "assaultive conduct was consistent with the custom

and practice at BCCF and, in fact, that such assaultive behavior upon a mentally ill inmate was

something which the [correctional officers] expected would be tolerated and not punished."  (*Id.*

¶ 67.)

        Bucks County argues that these allegations are insufficient to plead a government custom

because "[t]he mere fact that there have been prior lawsuits or media reports alleging assaults is

insufficient to demonstrate that the County Defendant or Defendant Lagana adopted a practice or

custom of mistreating mentally ill inmates."  (Doc. No. 61-1 at 9.)  But the fact that other

---

[10] Bucks County takes issue with Alexander's use of the terms, "mistreatment" and "mentally ill,"
arguing that because both phrases are "open for interpretation," Alexander has failed to identify a practice
or custom with specificity.  (*Id.* at 8–9.)  But it is clear from the First Amended Complaint that by
"mentally ill," Alexander is referring to inmates placed in the MHU and/or on suicide watch at BCCF.
(*See* Doc. No. 56 at ¶ 60 (describing other inmates "who, like Mr. Alexander, had been on suicide watch
at the time they were mistreated").)  Alexander also clearly alleges that by "mistreatment," he is referring
to the use of excessive force against these inmates, including the "frequent unreasonable and/or excessive
use of a restraint chair."  (*Id.* ¶¶ 60–63.)

inmates in the MHU at BCCF have complained about excessive force—and specifically, about being placed in a restraint chair without justification—suggests that Alexander's experience may be part of a broader practice at BCCF that was known and accepted by prison officials.  *See McTernan v. City of York*, 564 F.3d 636, 658–59 (3d Cir. 2009) (explaining that to state a municipal custom, the complaint must "specify what exactly that custom or policy was" and demonstrate "knowledge and acquiescence by the decisionmaker"); *Bielevicz v. Dubinon*, 915 F.2d 845, 851 (3d Cir. 1990) ("[T]o sustain a § 1983 action against the City, plaintiffs must simply establish a municipal custom coupled with causation—i.e., that policymakers were aware of similar unlawful conduct in the past, but failed to take precautions against future violations, and that this failure, at least in part, led to their injury."); *Gorman v. Warwick Twp.*, Civil Action No. 10–CV–6760, 2011 WL 1235198, at *6 (E.D. Pa. Apr. 1, 2011) ("While proof of a single incident of unconstitutional activity may not be sufficient, in and of itself, to establish liability under *Monell*, if a municipal entity can be shown to have tolerated known misconduct by police officers in the past or that its policymakers were aware of similar unlawful conduct in the past but failed to take precautions against future violations and that this failure at least in part caused the injury complained of, it may be liable.").

This inference is bolstered by the allegation that Alexander, who was housed at BCCF for only a limited period of time, was placed in the restraint chair without justification on another occasion.  (*See* Doc. No. 56 at ¶¶ 62–63.)  Finally, the number of officers that participated in the assault on Alexander, the involvement of *two* supervisors, the assault's occurrence in full view of other inmates and staff members, Nurse Hill's refusal to document the injuries, and Warden Lagana's attempts after the fact to stop Alexander from filing grievances, suggest this type of assault is "not an anomaly, but the norm" and that the officers feared neither reprisal nor

punishment for their actions.  *Cf. Garcia v. County of Bucks*, Civil Action No. 17-3381, 2018 WL 3585086, at *7 (E.D. Pa. July 25, 2018) (denying motion to dismiss *Monell* claims because "Plaintiff has specified the two offending policies.  And although Plaintiff does not name the individual municipal policymaker behind these policies, that information is unknowable to Plaintiff at this stage.  Moreover, there can be no doubt that the decision to house fifteen inmates in a single room for two weeks with a single toilet was not isolated happenstance but a deliberate decision by a Bucks County policymaker.  Just as Plaintiff's repeated top bunk assignments, both before and after his fall and in spite of several requests, demonstrate that his top bunk assignment was not an anomaly, but the norm").

Courts in this Circuit have found similar allegations sufficient at the pleading stage to state a claim for unconstitutional municipal custom.  *See Boyden v. Township of Upper Darby*, 5 F. Supp. 3d 731, 743 (E.D. Pa. 2014) ("Boyden also asserts facts to support his claim that the officers acted pursuant to a custom of allowing excessive force during arrests.  Boyden alleges that two Upper Darby officers were fired for use of excessive force and were then re-instated. He also cites two cases in which plaintiffs sued Upper Darby police officers for the use of excessive force during arrests.  Finally, he avers that Officer Sides participated in the beating of a Giovanni Mucci in September of 2013, and during that assault Officer Sides repeatedly used his taser.  These allegations, taken as true, suffice to state a claim that Upper Darby officers acted pursuant to a municipal custom condoning the use of excessive force during arrests.") (internal citation omitted); *Johnson v. City of Paterson*, No. 21cv19907 (EP) (JSA), 2022 WL 16570649, at *4–5 (D.N.J. Nov. 1, 2022) (finding that the plaintiff "sufficiently pleaded a claim for an unconstitutional custom" where she "specifically alleged that Officer Qirjak swung her into a wall and bench while she was in handcuffs at the police station," that "several officers witnessed

the incident and refused to intervene," and that the police department's internal affairs division found an officer acted wrongfully in one of the 93 excessive force complaints filed with the City between 2015 and 2019).

In sum, Alexander has plausibly alleged that Bucks County has a custom of using excessive force against inmates in the MHU at BCCF.  The motion to dismiss Count IV is denied.

### b.    Failure to Train

Alexander has also stated a plausible *Monell* claim under a theory of failure to train. Under this theory, a plaintiff must show "that the failure amounts to deliberate indifference to the rights of persons with whom . . . employees will come into contact."  *Thomas v. Cumberland County*, 749 F.3d 217, 222 (3d Cir. 2014) (quotation marks omitted).  In addition, the plaintiff must allege facts from which the court can infer that "the deficiency in training . . . actually caused the constitutional violation."  *Id.* (cleaned up).  Alexander has plausibly alleged both elements.

Deliberate indifference is "a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."  *Id.* at 223.  Typically, "'a pattern of similar constitutional violations by untrained employees' is necessary 'to demonstrate deliberate indifference for purposes of failure to train.'"  *Id.* (quoting *Connick v. Thompson*, 131 S. Ct. 1350, 1360 (2011)).  A pattern of prior violations places "municipal decisionmakers on notice that a new [training] program is necessary," and suggests that their continued adherence to an inadequate program amounts to a "conscious disregard for the consequences of their action—the deliberate indifference—necessary to trigger municipal liability."  *Id.* (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 407 (1997)).  If a plaintiff is unable to show a pattern of prior violations, his failure to train claim survives only if the need for training "can be

16

said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights."  *City of Canton v. Harris*, 489 U.S. 378, 390 n.10 (1989); *see also Bd. of Cnty. Comm'rs of Bryan Cnty.*, 520 U.S. at 409 (describing *City of Canton* as "hypothesiz[ing] that, in a narrow range of circumstances, a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations.  The likelihood that the situation will recur and that the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights could justify a finding that policymakers' decision not to train the officer reflected 'deliberate indifference' to the obvious consequence of the policymakers' choice"); *Owens v. Coleman*, 629 F. App'x 163, 167 (3d Cir. 2015) ("A pattern of similar constitutional violations is typically necessary to demonstrate deliberate indifference for purposes of failure to train. However, to establish deliberate indifference based on a single incident, a plaintiff must show that his injury was an 'obvious consequence' of the deficiency in the supervisor's training program.") (internal citations omitted).

Bucks County argues that Alexander's failure to train claim should be dismissed because he "does not identify what training policy BCCF has in place" and "does not allege whether the Defendant Officers were acting in compliance with BCCF policies."  (Doc. No. 61-1 at 9.)  The County cites no cases to support its argument that a plaintiff must identify the municipality's training policy and explain whether officers acted in accordance with that policy.  (*See id.*) Nevertheless, the Court notes that in *Owens*, the Third Circuit found that the plaintiff failed to plead a *Monell* claim on a theory of failure to train because the complaint not only failed to "describe the nature of Appellees' training program, it fail[ed] to point to specific deficiencies in that program, or explain how those deficiencies caused his injuries."  629 F. App'x at 167.  The

Court does not, however, view *Owens* as holding that a complaint must describe with specificity the ins and outs of the municipality's training program to survive a motion to dismiss—that information will almost always be in the hands of the municipal defendant. Instead, the complaint must identify the training program that the plaintiff believes is deficient, describe that deficiency, and explain how the deficiency caused the plaintiff's injuries. Alexander satisfied this standard here. He alleges that BCCF has no policy on the appropriate amount of force to be used in situations involving inmates with mental illnesses, and that BCCF's use of force training lacks specialized training on the appropriate amount of force to be used in such situations, and in particular, lacks training on the appropriate use of the restraint chair on inmates housed in the MHU. (Doc. No. 56 at 13 & 24 ¶ 104.)

Alexander has also sufficiently alleged that the need for this training is "so obvious" that the County's failure to have specialized training for officers working in the MHU could amount to deliberate indifference. *See City of Canton*, 489 U.S. at 289 ("[I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need."); *see also Townsend v. City of Chester*, CIVIL ACTION NO. 19-1023, 2020 WL 4347368, at *15 (E.D. Pa. July 29, 2020) ("Merely pleading that the City knew of a need for training and supervision but failed to adequately provide that training and supervision does not meet the requisite pleadings standards. Rather, Plaintiff must indicate in what manner that training or supervision was deficient and how additional training and supervision would have prevented the harm."). In *City of Canton*, the Supreme Court provided an example of when a

need for training is so obvious that the failure to provide it amounts to deliberate indifference:

> For example, city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons.  The city has armed its officers with firearms, in part to allow them to accomplish this task.  Thus, the need to train officers on the constitutional limitations on the use of deadly force can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights.

*Id.* at 390 n.10.

Like the example provided in *City of Canton*, here, Alexander alleges that policymakers know "to a moral certainty" that correctional officers working in the MHU at BCCF will be required to interact, and at times, use force, to restrain prisoners with mental illnesses—indeed, the prison provided a *restraint* chair for this purpose.  Alexander has also alleged facts which suggest law enforcement groups across the country recognize that inmates with mental illnesses are particularly vulnerable to use of force incidents.  In particular, Alexander references a policy adopted by the International Association of Chiefs of Police ("IACP"), titled "Dealing with the Mentally Ill," and alleges that it is widely recognized as "providing the prevailing standards for law enforcement and corrections officers' interactions with the mentally ill."  (Doc. No. 56 at ¶ 69 (alleging that the Public Agency Training Council ("PATC") and the Legal & Liability Risk Management Institute ("LLRMI"), have so recognized the IACP's policy).)  He also alleges that contrary to the IACP policy's "generally accepted standards," Bucks County has a "common practice" of forcibly placing inmates with mental illnesses in a restraint chair, like the Officer Defendants did to Alexander in this case.  (*Id.* ¶ 75.)

Finally, BCCF itself seems to recognize that inmates with mental illnesses present a different risk to themselves and/or others than the general population because the facility places them in a different unit than inmates without mental illnesses.  (*Id.* ¶ 67; *cf. id.* ¶¶ 72–73 (alleging that after the fact "one or more of the [Officer Defendants] was subjected to specialized

training" related to "Use of Force, documentation of Use of Force incidents, *interactions with mentally ill inmates, use of restraint chairs, and/or policies, practices, and procedures for inmates on 'suicide watch'*," suggesting that the County recognizes some need for specialized training in this area) (emphasis added).)   Therefore, it is reasonable to infer that failing to train MHU officers on when and how to use force against inmates with mental illnesses, and in particular, on how to use the restraint chair, presents an "obvious risk" that Bucks County ignored and that resulted in the allegedly unconstitutional use of the restraint chair and excessive force against Alexander.  *See Davis v. City of Philadelphia*, 284 F. Supp. 3d 744, 755–56 (E.D. Pa. 2018) ("[I]n a major city like Philadelphia, there can be no doubt that police officers will, as part of their duties, regularly transport detainees (and prisoners) with serious medical needs to and among the City's detention facilities.  Those detainees may be coming from a hospital to a detention facility, or moving from one facility to another—this case involves both scenarios.  It is plausible then, that the need to train police to relay urgent medical information could be 'so obvious' that a failure to do so would amount to deliberate indifference.")

Whether Alexander can ultimately prove that policymakers ignored an "obvious risk" is a question to be explored in discovery.[11]  The motion to dismiss Count V is denied.

_____

[11] Even if Alexander is ultimately unable to prove his claim for failure to train under a theory of obvious risk, he may still be able to support that claim with evidence that BCCF was aware of a pattern of officers using excessive force (and in particular, improperly using the restraint chair) against inmates in the MHU.  *See Gorman*, 2011 WL 1235198, at *6 ("[I]f a training program does not prevent constitutional violations, municipal decisionmakers may eventually be put on notice that a new program is called for.  In that event, their continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the 'deliberate indifference'—necessary to trigger municipal liability.") (cleaned up); *see also Garey v. Borough of Quakertown*, Civil Action No. 12–799, 2012 WL 3562450, at *6 (E.D. Pa. Aug. 20, 2012) ("The Complaint alleges that the Borough of Quakertown failed to properly train Officers Baccari and Grill in how to properly place a prisoner in custody in a police car without resorting to use of a Taser when that suspect is already handcuffed, in a police car, and poses no physical threat.  The Complaint also alleges that the officers in the Borough of Quakertown have a history of verbal and physical abuse and police brutality toward citizens in circumstances similar to those here.  Moreover, the Complaint alleges that the Borough of Quakertown had, prior to the date of the incident

### C.   Supervisory Liability

Next, Warden Lagana challenges Count III, which asserts individual capacity claims against him under a theory of supervisory liability.  (*See* Doc. No. 61-1 at 9–12; Doc. No. 56 at 20–21.)

The Third Circuit has recognized two theories of supervisory liability.  *See A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Detention Ctr.*, 372 F.3d 572, 585–86 (3d Cir. 2004).  First, a supervisor may be liable for his role as a policymaker if it is shown that he, "with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused the constitutional harm."  *Id.* (quoting *Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 725 (3d Cir. 1989)).  "The second theory of liability provides that a supervisor may be personally liable under § 1983 if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations."  *Id.*  Warden Lagana argues that Count III should be dismissed because Alexander has not alleged that he was personally involved in the violation of Alexander's Fourteenth Amendment rights under either theory.  (Doc. No. 61-1 at 9.)

Alexander responds that Warden Lagana is liable under the second theory of liability because he was the individual "in charge" and "had knowledge of and acquiesced in his subordinates' violations."  (Doc. No. 63 at 11–12.)  He argues that Warden Lagana's attempts to quiet Alexander's grievances were "volitional acts which are sufficient to constitute both 'knowledge' and 'acquiescence.'"  (*Id.* at 13.)  A review of the case law shows that courts often require evidence that a supervisor had *contemporaneous* knowledge of a subordinate's

---

involving Plaintiff, permitted, tolerated, and negligently overlooked the inappropriate use of Tasers by its officers and failed to train them in the proper use of Tasers on arrestees.").

unconstitutional acts before they will find a supervisor liable under this theory. *See, e.g.*, *Bornstein v. County of Monmouth*, Civ. No. 11–5336, 2014 WL 6908925, at *4–5 (D.N.J. Dec. 9, 2014) ("Sgt. Noland was physically present and overseeing his subordinates' actions during the course of [the plaintiff's] confinement at MCCI.  Specifically, he observed his subordinates' use of force and at a few points issued orders directing these officers to leave [the plaintiff] on the ground in the nurse's station, to shackle him when he was kicking, and to remove his clothes and take control of his arms while he was resisting in the constant watch cell.  Thus, a reasonable jury could find that at a minimum, Sgt. Noland had contemporaneous knowledge of and acquiesced to [the plaintiff's] treatment by other officers."); *Robles v. Casey*, No. 1:10–cv–2663, 2011 WL 2292286, at *2 (M.D. Pa. June 8, 2011) ("None of the Supervisory Defendants are alleged to have had contemporaneous knowledge of the incident.  Accordingly, Plaintiff is only able to state a claim to the extent that he is able to show knowledge of a prior pattern of similar incidents coupled with circumstances indicating a message of approval.").

Nevertheless, some courts, including the Third Circuit, have suggested that a supervisor may be liable when he has knowledge of similar, past unconstitutional misconduct and takes affirmative steps to approve of or acquiesce in that misconduct.  *See Zion v. Nassan*, 556 F. App'x 103, 109 (3d Cir. 2014) (finding in the context of a claim for qualified immunity that "[t]he amended complaint specifically alleges that the supervisory defendants were aware of a 2008 jury finding that Nassan was liable for the shooting death of a twelve-year-old boy.  The supervisors allegedly did not order additional training for Nassan, and one of them allegedly ordered a subordinate to alter Nassan's employment records.  These allegations establish that the supervisory defendants were aware of a pattern of violent behavior by Nassan and did nothing to remedy the situation.  At the time of the shooting, binding precedent held that a supervisor may

22

be liable for his subordinate's constitutional violations if the supervisor 'had knowledge of and acquiesced in' the violations" (citing *A.M. ex rel. J.M.K.*, 372 F.3d at 586)); *Plouffe v. Cevallos*, Civil Action No. 10–1502, 2012 WL 1994785, at *4 (E.D. Pa. June 1, 2012) ("To impose liability, there must be both (1) contemporaneous knowledge of the offending incident *or knowledge of a prior pattern of similar incidents*, and (2) circumstances under which the supervisor's assertion could be found to have communicated a message of approval to the offending subordinate." (citing *Colburn v. Upper Darby Twp.*, 838 F.2d 663, 673 (3d Cir. 1988)) (emphasis added).)

The parties do not discuss this distinction in their briefing, even though their arguments appear to hinge on the issue.  (*Compare* Doc. No. 61-1 at 10–11 ("There are no factual allegations that Defendant Lagana personally participated with others in violating Plaintiff's rights or directed others to violate them."), *with* Doc. No. 63 at 12 ("Mr. Alexander alleged that Defendant Lagana's affirmative volitional act of initiating a conversation with him about the assault constituted 'knowledge' under the legal standard.").)  Given the limited analysis by the parties; the Third Circuit's holding in *Zion*; and the First Amended Complaint's allegations that BCCF has a custom of using excessive force against inmates with mental illnesses, that Warden Lagana knew about that custom and the July 6, 2018 assault on Alexander, and that Warden Lagana attempted to quiet Alexander's complaints about that assault, dismissal is inappropriate at this early stage of the proceedings.[12]  If appropriate, Warden Lagana may raise this issue again

---

[12] Similarly, it is unclear at this stage whether, under the first theory for finding supervisory liability, Warden Lagana is the relevant decisionmaker, and if so, whether he is responsible for the custom of misconduct and the failure to train discussed earlier in this Memorandum.  *See A.M. ex rel. J.M.K.*, 372 F.3d at 586 ("Evidence in the record shows that Brulo and Kwarcinski had responsibility for developing policies and procedures for the Center.  Given our conclusion that A.M. presented sufficient evidence to present a jury question on whether the Center's policies and procedures caused his injuries, we conclude summary judgment in favor of Brulo and Kwarcinski in their individual capacities was inappropriate."); *Ringgold v. Keller*, Civil Action No. 11–974, 2012 WL 1801713, at *5 (W.D. Pa. Apr. 18, 2012), *report*

at summary judgment.

Accordingly, Warden Lagana's motion to dismiss Count III is denied.

### D.    Punitive Damages

Finally, Defendants ask that Alexander's request for punitive damages be stricken because "punitive damages may not be awarded against municipal defendants." (Doc. No. 61-1 at 11.) Defendants are correct that Alexander may not seek punitive damages as against Bucks County. *See City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 268 (1981) (concluding that "the deterrence rationale of § 1983 does not justify making punitive damages available against municipalities"). Alexander acknowledges as much and states that he is not seeking damages against the County. (Doc. No. 63 at 20 ("To be clear, Mr. Alexander does not seek punitive damages against any municipal defendant.").) Alexander's punitive damages request is broadly asserted against all Defendants, not just Bucks County, and he seeks punitive damages only "to the extent permitted[ ] by law." (*See* Doc. No. 56 at 25 ¶ 2; *see also* Doc. No. 63 at 20 ("[Alexander] does, however, maintain his right to seek punitive damages 'as permitted, and to the extent permitted, by law'—specifically, against the seven (7) [Officer Defendants] who he has asserted participated in the physical assault against him.").) Given the request's broad scope

---

*and recommendation adopted* 2012 WL 1801737, at *1 (W.D. Pa. May 16, 2012) ("In his Complaint, Plaintiff claims that Defendant Coleman, in his capacity as Superintendent at SCI–Fayette, was responsible for developing policies and procedures regarding the prison's day-to-day operations including monitoring, supervising, training, retraining, and disciplining employees. He contends that Defendant Coleman had prior knowledge of another instance whereby an inmate had been assaulted by Defendant Keller; that Coleman acted with deliberate indifference by failing to maintain a policy, practice, or custom of monitoring, supervising, training, retraining, and disciplining correctional officers such as Defendant Keller who had been involved in assaults on inmates in the past; and that said deliberate indifference contributed to and proximately caused his injuries. He further claims that Defendant Coleman acted with deliberate indifference by failing to enforce the DOC's Use of Force policy and that this failure also contributed to and proximately caused his injuries. Reading these allegations in the light most favorable to Plaintiff, the Court cannot conclude that there is no set of facts under which Plaintiff might establish supervisory liability against Defendant Coleman.").

and limiting language, the Court declines to strike the request for punitive damages at this time.

**IV.     CONCLUSION**

The motions to dismiss are denied for the reasons discussed above.  In the alternative, the motions are denied because Moving Defendants failed to comply with Judge Marston's Policies and Procedures.  *See* J. Marston's Policies & Procedures at 8 ("Before filing a motion pursuant to Fed. R. Civ. P. 12(b)(6), counsel shall first contact opposing counsel to discuss the substance of the contemplated motion and to provide an opportunity to cure any alleged pleading deficiencies. . . .  The Court will deny a 12(b)(6) motion that does not meet these requirements.").[13]

An appropriate Order follows.

---

[13] These Policies and Procedures are publicly available on the Court's website: https://www.paed.uscourts.gov/documents/procedures/marpol.pdf.  If Defendants fail to comply with Judge Marston's Policies and Procedures in the future, the Court may summarily deny the noncompliant motion and/or strike the noncompliant filing from the Docket.